UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SANDRA SMITH, aka SANDRA MECHAM,<br><br>               Plaintiff,<br><br>v.<br><br>LIBERTY LIFE ASSURANCE COMPANY OF BOSTON,<br><br>               Defendant. | Case No. 4:14-cv-00495-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Plaintiff Sandra Smith filed a complaint on October 29, 2014, against Liberty Life Assurance Company of Boston (Liberty) pursuant to the Employee Retirement Income Security Act of 1974 (ERISA) to recover benefits due and to enforce her rights under the terms of a group disability income policy (the Policy). Pending before the Court are the parties' cross motions for summary judgment. Smith claims Liberty wrongfully withheld benefits owed to her. Liberty claims it was exercising its contractual reimbursement rights under the Policy.

The Court conducted a hearing on February 9, 2016, and both parties appeared to present oral argument. After careful consideration of the parties' briefs, applicable legal

MEMORANDUM DECISION AND ORDER - 1

authorities, and argument, the Court will grant the motion filed by Liberty and deny the motion filed by Smith.

## FACTS

On November 18, 2010, Smith was involved in a serious motor vehicle accident resulting in traumatic brain injury rendering Smith disabled. Prior to the accident, Smith worked as a loan officer employed by Wells Fargo Bank earning in excess of $80,000 per year. However, she was unable to return to work because of cognitive difficulties secondary to traumatic brain injury from the accident. At the time of the accident, Smith was 39 years of age, and she was covered under the terms of a group disability income policy issued by her employer. The Policy provided both short and long term disability coverage. (Dkt. 28-1 at 3.) The short term plan was sponsored and self-insured by Wells Fargo, although Liberty provided claims administrative services for Wells Fargo. Liberty was the plan administrator, however, under the long term plan. *Id.*

The driver of the other vehicle in the accident with Smith was found at fault. The third party had a "single limit" liability insurance policy of $100,000.00, which sum included property damage and bodily injury. Smith's property damage claim of $37,449.03 was paid shortly after the accident, leaving $62,550.97 for Smith's bodily injury claim. The policy limit ($62,550.97) was accepted, and Smith's attorney received the funds on his client's behalf on or about December 2, 2012. (Dkt. 27-2 at 8.)[1]

---

[1] The settlement check was made payable jointly to Plaintiff's attorney and Plaintiff.

**MEMORANDUM DECISION AND ORDER - 2**

On December 28, 2012, Liberty claimed subrogation of the amount of $81,387.42, comprised of $25,700.49 in short term disability benefits paid to Smith from May 13, 2011, through November 3, 2011, and $55,686.93 in long term disability benefits paid to Smith from November 4, 2011, through December 28, 2012. Liberty requested reimbursement of all disability benefit payments made by Liberty should Smith recover from the responsible party in the accident, and Liberty claimed a lien against any monies Smith received from any third party.

By that time, Smith had suffered $47,920.23 in past medical special damages, and Smith's attorney was owed $26,349.22, leaving insufficient funds to pay Smith's medical care providers, her attorney, and Liberty out of the $62,550.97 in settlement funds. (Dkt. 27-2 at 5.) On January 9, 2013, Smith requested that Liberty "waive [its] short term and long term subrogation amounts." (Dkt. 27-2 at 4). Liberty refused Smith's offer, instead offering on January 28, 2013, to "reduce [its] lien to accept [its] pro rata share" of the settlement funds in the amount of $17,102.59. (Dkt. 27-2 at 15.) Liberty's letter further stated:

> Please let this confirmation serve as a full & final settlement release of lien upon receipt of payment of $17,102.59. This release pertains to and only to Liberty Life Assurance's subrogation provision for Short Term Disability Benefits claim # 4044567 and Long Term Disability Benefits claim # 4142343. *All other Short and/or Long Term Disability contract provisions are still applicable.*

(Dkt. 27-2 at 15-16; emphasis added.) On February 20, 2013, Smith tendered payment of $17,102.59 to Liberty ($5,400.65 payable to Wells Fargo & Company and $11,701.94 payable to Liberty). (Dkt. 27-3 at 2.)

**MEMORANDUM DECISION AND ORDER - 3**

Smith was encouraged by Liberty to apply for Social Security Disability benefits.[2] In or about January of 2014, Smith received an award of benefits retroactive to October 2011; pursuant to the social security ruling, she received a lump sum award of past due benefits in the amount of $45,348.67. (Dkt. 27-5 at 3.) The Social Security Administration withheld $6,000.00 from her past due benefits to pay her attorney's fees. (Dkt. 27-3 at 9.) Smith therefore received a lump sum of $39,348.67. (Dkt. 27-5 at 4.) Smith was notified also that she would receive monthly benefits from Social Security in the amount of $1,549.40 for January of 2014, and $1,969.00 per month thereafter. (Dkt. 27-3 at 7.)

On December 16, 2013, Liberty had notified Smith that, under the terms of the Policy, Liberty would reduce her disability benefits "by the amount of income [she] received from other sources, including [Social Security Disability Benefits]." (Dkt. 27-6.) Liberty explained that, because it paid disability benefits to Smith through December 3, 2013, it had advanced Smith the money Social Security would ultimately pay. (Dkt. 27-6 at 2.) Liberty requested repayment of the "overpayment" from her lump sum Social Security benefit payment.

On February 10, 2014, Liberty notified Smith as to how it calculated the overpayment of benefits, and explained the justification for the repayment demand. (Dkt.

---

[2] Smith characterizes Liberty's letters directing her to apply for benefits as "threatening." Liberty did indicate it would reduce Smith's disability benefit by an "estimated Social Security Disability amount effective December 16, 2011," if she failed to apply for benefits. (Dkt. 27-5 at 9.) Whether the tone of the letters may be characterized as threatening is not material for purposes of deciding the motions before the Court.

**MEMORANDUM DECISION AND ORDER - 4**

27-6 at 5; 28-2 at 84.)³ Liberty requested repayment of $45,348.47. On May 15, 2014, Liberty again demanded payment totaling $45,348.47. (Dkt. 27-5 at 4.) Smith refused to pay, asserting that Liberty's prior release of lien constituted a full release of its subrogation rights. (Dkt. 27-4 at 12; Dkt. 27-5 at 4; Dkt. 28-2 at 89.)

On June 2, 2014, Liberty notified Smith's attorney that its request for reimbursement, to be paid from Smith's Social Security award, "is not a lien and in no way relates to the prior 3rd party settlement due to her auto accident." (Dkt. 27-4 at 2.) Liberty's letter explained it was seeking reimbursement pursuant to the other income benefits provision of its policy with Smith.

Liberty reiterated its position via letter dated September 24, 2014, explaining that the Subrogation and Reimbursement provision contained in Section 7, and the Other Income Benefits provision contained in Section 4, are two separate policy provisions, and that Liberty intended to exercise its right to withhold future benefits if repayment was not received. (Dkt. 27-4 at 9.) In September of 2014, Liberty ceased paying Smith her monthly disability payments in the amount of $2,343.61 for failure to pay the $45,348.47 demanded. (Dkt. 27-5 at 4.) Liberty explained it would credit the unpaid disability payments toward the overpayment amount due until such time as Liberty was reimbursed.

Liberty claimed its right to withhold payment of benefits under Section Four of the Policy. First, the Policy defines "Other Income Benefits" as "[t]he amount of Disability

---

³ Docket 28-2 at 84 contains a summary chart of how Liberty calculated the reimbursement amount, attached to this Memorandum Decision and Order as Appendix 1.

**MEMORANDUM DECISION AND ORDER - 5**

and/or Retirement benefits under the United States Social Security Act … or any other similar plan or act, which …the Covered Person receives or is eligible to receive….” Policy Section 4 (Dkt. 28-2 at 27.) The Policy explains that the amount of Monthly Benefit is calculated by taking the calculated Monthly Benefit, and deducting Other Income Benefits from that amount. (Dkt. 34-3 at 22.) If an overpayment is due to Liberty, Section Four of the Policy states that the Minimum Monthly Benefit otherwise payable "will be applied toward satisfying the overpayment."

> Next, the Policy explains that:
>
> Liberty will reduce the Covered Person's Disability or Partial disability benefits by the amount of Other Income Benefits that we estimate are payable to the covered Person and his dependents. The Covered Person's Disability benefit will not be reduced by the estimated amount of Other Income Benefits if the Covered Person:
> 1.   provides satisfactory proof of application for Other Income Benefits; [and]
> 2.   signs a reimbursement agreement under which, in part, the Covered Person agrees to repay Liberty for any overpayment resulting from the award or receipt of Other Income Benefits.

(Dkt. 28-2 at 29.)

> Section Seven, the Subrogation and Reimbursement provision of the Policy, states:
>
> When Liberty has paid benefits under this policy in an amount in excess of $5,000 to a Covered Person, Liberty will be subrogated to all rights of recovery that the covered Person has against any third party. Liberty may require an assignment from the covered Person of his right to recover to the extent of Liberty's payment. Liberty's subrogation rights under this provision will be valid only if the Covered Person is fully compensated for his loss.

(Dkt. 28-2 at 40.)

**MEMORANDUM DECISION AND ORDER - 6**

In addition to the Policy provisions, Liberty relied upon two ancillary agreements Smith signed when crediting the benefits payments to the repayment amount owed. On September 20, 2011, Smith signed a reimbursement agreement related to Section Seven of the Policy and the claims Smith had against the tortfeasor, wherein Smith agreed to "repay the Plan Sponsor for such benefits to the extent they are for losses for which compensation is paid to the covered person by or on behalf of the person at fault; [and] to allow the Plan Sponsor a lien on such compensation." (Dkt. 28-2 at 48.) The agreement further stated that, "when the Plan Sponsor has paid benefits to or on behalf of the injured covered person, the Plan Sponsor will be subrogated to all rights of recovery that the covered has against the person at fault. These subrogation rights will extend only to recovery of the amount the Plan Sponsor has paid."

Smith, on September 25, 2011, signed also a Social Security Reimbursement Agreement, related to Section Four of the Policy, wherein she agreed that:

> If disability benefits are approved I request that Liberty Life Assurance Company of Boston (Liberty Life) pay me my benefit with <u>no reduction</u> for estimated Social Security Disability benefits until Social Security makes a decision. I understand that this may result in an overpayment of disability benefits paid to me if Social Security subsequently awards benefits to me, and I understand that I must repay this overpayment to Liberty Life. In consideration of Liberty Life paying me a disability benefit with no reduction for estimated Social Security benefits until Social Security makes a decision, I agree to the following: … If Social Security awards benefits to me, I agree that Liberty Life has a first lien on all such benefits to the extent of any overpayment or debt, and I agree to hold all such Social Security benefits in a trust for the benefit of Liberty Life until the amount of Liberty Life's overpayment has been repaid in full.

(Dkt. 28-2 at 55.)

**MEMORANDUM DECISION AND ORDER - 7**

## ANALYSIS

**1.   Summary Judgment Standard**

The filing of cross-motions for summary judgment—where both parties essentially assert that there are no issues of material fact—does not vitiate the court's responsibility to determine whether disputed issues of material fact are present. *Fair Housing Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir.2001). Summary judgment cannot be granted if a genuine issue as to any material fact exists. *Id*.

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

**2.   ERISA Standard of Review**

Smith brings her claim pursuant to ERISA's civil enforcement provision. *See* 29 U.S.C. § 1132(a)(1)(B). Section 1132 provides that a "civil action may be brought ... by a participant ... to recover benefits due to him under the terms of his plan [or] to enforce his rights under the terms of the plan." *Id*. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives

the administrator ... discretionary authority to determine eligibility for benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Here, under the terms of the Policy, Liberty possesses the authority to construe the terms of the Policy and to determine benefit eligibility.[4] When a plan confers discretionary authority on a plan administrator to construe the terms of a plan and to determine benefit eligibility, the abuse of discretion standard applies. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The United States Court of Appeals for the Ninth Circuit has held that an "apparent" conflict of interest exists whenever a plan administrator is responsible for both funding and paying claims. *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1108 (9th Cir. 2000). Standing alone, an apparent conflict does not affect the ultimate standard of review. *McDaniel*, 203 F.3d at 1108. It does, however, require the Court to look further into the plan administrator's dual role by applying the "less deference" test. *Id.*

Under the "less deference" test, a plan participant must come forward with "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations." *Id.* (quoting *Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1322–23 (9th Cir.1995)). Only if the plan participant satisfies that burden does the burden of proof shift to the plan administrator to produce evidence that the apparent conflict of interest did not affect the decision to deny benefits. *Id.* (citing *Atwood*, 45 F.3d at 1323 (stating that the

---

[4] Section 7 of the Policy states that "Liberty shall possess the authority to construe the terms of this policy and to determine benefit eligibility hereunder." (Dkt. 34-3 at 38.)

**MEMORANDUM DECISION AND ORDER - 9**

plan administrator's decision is "presumptively void")). If the burden shifts and the plan administrator does not produce evidence that the apparent conflict of interest did not affect the decision to deny benefits, the court must "review the decision de novo, without deference to the administrators tainted decision." *Id.* (quoting *Atwood*, 45 F.3d at 1323). Otherwise, the Court reviews the plan administrator's decision under the traditional abuse of discretion standard.

Here, Smith has not come forward with any argument or evidence that would tend to show the plan administrator's self-interest caused a breach of the administrator's fiduciary obligations. Accordingly, the Court will assign the conflict of interest little weight in its abuse of discretion analysis.

The Court may find Liberty abused its discretion if it (1) rendered a decision without explanation, (2) construed provisions of the policy in a way that conflicts with the plain language of the plan, or (3) relied on clearly erroneous findings of fact. *Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 944 (9th Cir. 1999)). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 622 (1993)). The Court must uphold the decision of an ERISA plan administrator "if it is based upon a reasonable interpretation of the plan's terms and was made in good faith." Boyd, 410

F.3d at 1178 (quoting *Estate of Shockley v. Alyeska Pipeline Serv. Co.*, 130 F.3d 403, 405 (9th Cir. 1997)).

### 3. Application of the Abuse of Discretion Standard

Based upon the above authorities, the Court considers whether Liberty abused its discretion when it determined that Smith was required to reimburse the plan sponsors for overpayment of benefits relative to the social security benefits award she received retroactive to October of 2011. In examining the Policy's language, the Court applies contract principles derived from state law, but is guided by the policies expressed in ERISA and other federal labor laws. *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997). The Ninth Circuit requires that terms in an ERISA plan be interpreted "'in an ordinary and popular sense as would a [person] of average intelligence and experience.'" *Id*. (quoting *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997)). More specifically, the Ninth Circuit directs the Court should "first look to explicit language of the agreement to determine, if possible, the clear intent of the parties. The intended meaning of even the most explicit language can, of course, only be understood in the light of the context that gave rise to its inclusion." *Id.* (quoting *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991)).

Each provision in an agreement must be construed consistently with the entire document such that no provision is rendered nugatory. *Id*. But, when a plan is ambiguous, the Court must examine extrinsic evidence to determine the intent of the parties. *Id.* If, after applying the normal principles of contractual construction, the insurance contract is

**MEMORANDUM DECISION AND ORDER - 11**

fairly susceptible of two different interpretations, the rule of construction requiring the interpretation most favorable to the insured will be adopted. *Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 625 (9th Cir. 2007). But, the rule requiring interpretation most favorable to the insured in the event of ambiguous terms will apply except where the plan: (1) grants the administrator discretion to construe its terms, (2) is the result of a collective-bargaining agreement, or (3) is self-funded. *Id.* Here, because the plan grants the administrator discretion to construe its terms, the rule does not apply and the Court must be guided by whether Liberty abused its discretion. *Id.*

Smith contends Liberty is not entitled to receive any portion of her lump sum social security award for past due benefits, because Liberty released its subrogation lien on January 28, 2013. However, Smith confuses Liberty's lien release pertaining to the third party insurance proceeds with Liberty's ability to reduce benefits from other income sources under the "Other Income Benefits" provision. The Other Income Benefits provision in Section Four of the Policy unambiguously requires that an employee's monthly long term disability benefits be reduced by the amount of other income sources, which includes social security benefits the employee may receive. Liberty's interest in Smith's income from other sources is so broad that Liberty can reduce monthly disability payments simply by estimating the amount of other income benefits Liberty believes will be payable to its insured, even if the insured employee is not actually receiving such benefits. Only if the insured employee provides proof that she has applied for social security disability benefits, signs a reimbursement agreement, and provides proof that all

**MEMORANDUM DECISION AND ORDER - 12**

appeals have been exhausted, will Liberty not reduce the monthly benefit payable to the insured.

In conjunction with the Other Income Benefits provision, the Policy contains a recovery provision, which indicates that if an overpayment is due to Liberty, the monthly benefit otherwise payable will be applied toward satisfying the overpayment. Additionally, Smith signed a Reimbursement Agreement to avoid reduction of her monthly benefit by an estimate of Social Security disability payments. The agreement states that, in the event Smith received a lump sum payment from the Social Security Administration, Smith agreed Liberty had a first lien on all such benefits to the extent of any overpayment, and Smith agreed to reimburse Liberty for any overpayment.

Liberty was therefore entitled to recover overpayment of any other benefits that Smith might receive, and by signing the Reimbursement Agreement, Smith explicitly agreed that, if she later received Social Security disability benefits, she would reimburse the full amount of the overpayment to Liberty. *See Ayers v. Life Ins. Co. of North Am.*, 869 F.Supp.2d 1248, 1268 (D. Ore. 2012) (construing similar policy language and reimbursement agreement). The unambiguous terms of the Policy establish that Liberty's interest in any overpaid benefits was entirely separate from any lien it claimed in proceeds Smith received from settlement of claims Smith had against a tortfeasor (and the tortfeasor's insurer), as provided by Section Seven, a separate and distinct provision of the Policy.

The January 28, 2013 letter from Liberty to Smith did not operate, by its terms, to extinguish Liberty's reimbursement rights under the Policy. Rather, the express terms of

the letter agreement, which Smith agreed to, indicated Liberty agreed to reduce its subrogation lien in the third party insurance proceeds under Section Seven of the Policy. Liberty expressly stated it did not waive any other short or long term subrogation interest, and further, Liberty reserved its right to enforce "all other Short and/or Long Term Disability contract provisions." By the terms of the letter, Liberty did not agree to relinquish its rights under the Other Income Benefits provision, the overpayment provision, and the terms of the agreement Smith signed allowing Liberty to collect any overpayment of benefits in return for Liberty refraining from deducting an estimated monthly social security benefit from Smith's monthly disability benefit.

While the result here may seem harsh to Smith, the Court cannot ignore the plain language of the Policy, or the express terms of the limited release Liberty agreed to, so that the effects may ameliorate Smith's financial situation. The Policy was not intended to provide Smith with a windfall in the event she collected past due social security benefits. In light of the level of discretion afforded to Liberty under the Policy, and the plain meaning of the policy language, the Court concludes Liberty's release did not alter or extinguish its ability to collect an overpayment pursuant to the Other Income Benefits provision in the Policy. Accordingly, the Court finds that Liberty's decision to withhold the monthly benefit until the overpayment is satisfied is not an abuse of discretion.

Despite so holding, the Court cannot enter final judgment in this matter. In addition to claiming benefits due, Smith's complaint sought also clarification of her rights under the Policy, which the Court concludes requires determining whether the

**MEMORANDUM DECISION AND ORDER - 14**

reimbursement amount Liberty claims it is owed is correct. However, neither motion before the Court sought a determination of the reimbursement amount.

During the hearing before this Court on February 9, 2016, the Court inquired as to Liberty's method of calculating the $45,348.47 reimbursement amount it claimed Smith owed from her lump sum social security benefit award. Liberty offered to provide the Court with an explanation, which the Court determines is appropriate here to resolve the outstanding claim contained in Smith's complaint as to her right, if any, to retain some portion of the $45,348.67 in past Social Security Disability benefits she was awarded. Determination of that question depends upon Liberty's calculations. If, as Liberty claimed at the hearing it determined the reimbursement amount by calculating what it paid Smith for the period October 1, 2011, through February 3, 2014, and subtracting what it should have paid for that same period, Liberty's math does not appear to compute. The Court questioned also during the hearing why Liberty deducted $11,701.94, and not $17,102.59, to reflect the entire subrogated amount.

## CONCLUSION

For the reasons discussed, Liberty's motion for summary judgment will be granted in part and denied in part. The Court determines Liberty is entitled to a declaratory judgment that it has the right to seek reimbursement of overpayment under the terms of Section Four of the Policy. But, the Court cannot enter a take nothing judgment on Smith's claims in this action as Liberty requests. Smith's motion, to the extent it requested recovery of benefits due, will be denied. The Court is unable to enter final

**MEMORANDUM DECISION AND ORDER - 15**

judgment in this matter because, on the record before it, the Court cannot clarify Smith's right, if any, to retain a portion of the lump sum Social Security Benefit award.

The parties are therefore required to submit a stipulation resolving the remaining issue, or alternatively, Liberty may submit a five page brief explaining in more detail how Liberty arrived at the $45,348.47 reimbursement amount. Smith will have an equal opportunity to respond. However, the parties are not to submit any further argument or briefing on Liberty's ability to enforce its right to reimbursement of other income benefits under the Policy, as the Court has resolved that issue in Liberty's favor.

## **ORDER**

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Plaintiff's Motion for Summary Judgment (Dkt. 27) is **DENIED**.

2) Defendant's Motion for Summary Judgment (Dkt. 34) is **GRANTED in PART and DENIED IN PART**.

3) On or before **March 17, 2016**, the parties are to submit a proposed Stipulation resolving the outstanding issue before the Court. If the parties are unable to reach agreement, Liberty may submit a brief no longer than five pages. Smith will have seven (7) days to respond with her brief of no longer than five pages.

Dated: **March 03, 2016**

Honorable Candy W. Dale
United States Magistrate Judge